Opinion filed April 15,
2010

 

 

 

 

 

 

 

                                                                        In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                   Nos. 11-08-00127-CV & No. 11-08-00171-CV

                                                    __________

 

                           DISCOVERY OPERATING, INC., Appellant

 

                                                             V.

 

                    BP
AMERICA PRODUCTION COMPANY, Appellee

 



 

                                         On
Appeal from the 385th District Court

 

                                                        Midland
County, Texas

 

                                     Trial
Court Cause Nos. CV44540 & CV46312

 



 

                                                                  O
P I N I O N








Discovery Operating, Inc. encountered a
highly pressurized water flow while drilling an oil well.  After investigating
the matter, Discovery believed that BP America Production Company=s operation of two
injection wells caused the water flow.  Discovery brought suit against BP to
recover damages that allegedly resulted from the water flow.  Discovery
asserted claims for negligence, negligence per se, and common-law and statutory
waste.  The trial court granted summary judgment to BP on Discovery=s negligence per se claims
and severed those claims from the remainder of the case.[1] 
The parties proceeded to a jury trial on Discovery=s other claims.  The jury returned a verdict
in favor of BP, and the trial court rendered a take-nothing judgment against
Discovery.

In Cause No. 11-08-00127-CV, Discovery
asserts that the trial court erred in granting summary judgment on its
negligence per se claims.  Based on the Texas Supreme Court=s recent holding in Exxon
Corp. v. Emerald Oil & Gas Co., L.C., No. 05-0729, 2009 WL 795760 (Tex.
March 27, 2009, reh=g
granted), and as explained in this opinion, we conclude that the trial court
erred in granting summary judgment to BP on Discovery=s negligence per se claims.  Because Discovery=s negligence per se claims
are inextricably intertwined with its other claims, we conclude that the error
in granting summary judgment on the negligence per se claims harmed Discovery
in the presentation of its entire case.  Therefore, the error in granting
summary judgment in Cause No. 11-08-00127-CV necessitates a reversal and a
remand of each of the trial court=s
judgments in both appellate causes.

In Cause No. 11-08-00171-CV, Discovery
complains of four evidentiary rulings.  Discovery asserts that the trial court
erred in the following respects: 

(1) in admitting testimony from BP=s expert, William D. Griffin, that Discovery
encountered a cavern while drilling its well because Griffin=s Acavern@
testimony was based on speculation and constituted a new opinion that had not
been disclosed before trial;

 

(2) in admitting testimony from BP=s experts, Roy C. Williamson and Dr. William
M. Cobb, about  injection pressure data relating
to Queen injection projects because such testimony amounted to a previously
undisclosed expert opinion that the Queen projects caused the water flow that
Discovery encountered in drilling its well;

 

(3) in excluding testimony from Discovery=s expert, Don Sparks, that
BP violated the standard of care for operating its injection wells because the
issue of whether BP violated the standard of care for operating such wells is
not a matter within the knowledge and experience of the average juror; and

 








(4) in admitting expert testimony from two Texas Railroad
Commission employees, Stephen Christopher Boger and Joe Millhollon, that no
correlation existed between BP=s
injection wells and the water flow in Discovery=s
well because their testimony had not been tested during the Daubert[2]
proceedings.

 

For the reasons stated in this opinion, we conclude that the
trial court erred (1) in admitting Griffin=s
Acavern@ testimony, (2) in
admitting Williamson=s
and Dr. Cobb=s
pressure injection data testimony, and (3) in excluding testimony from Don
Sparks that BP violated the standard of care for operating its injection wells. 
We also conclude that the evidentiary errors harmed Discovery and necessitate
reversal of the trial court=s
judgment in Cause No. 11-08-00171-CV.

Therefore, based on the trial court=s erroneous summary
judgment on Discovery=s
negligence per se claims, we reverse the judgments of the trial court in Cause
No. 11-08-00127-CV and Cause No. 11-08-00171-CV.  In addition, based on the
trial court=s
erroneous evidentiary rulings, we reverse the trial court=s judgment in Cause No.
11-08-00171-CV.  We remand both causes to the trial court for further
proceedings consistent with this opinion.

                                                        Introduction

Discovery encountered a highly pressurized
flow of brine water at a depth of about 3,895 feet while drilling its Geronimo
15, No. 6 well.[3]  Initially,
the water flowed from the well at a rate of about 1,500 to 1,600 barrels per
hour, and water continued to flow from the well until Discovery brought the
well under control six or seven days later.  As a result of the water flow and
actions that had to be taken to control the well, Discovery could not complete
it.

Because no similar problems had occurred in
the area in the past, Discovery concluded that the water flow in the 15-6 well
had not been caused by a natural occurrence but, instead, had been caused by
man-made subsurface injection.  After investigating various injection projects
in the area, Discovery concluded that BP=s
operation of its Sanders A 25 injection well (the 25 well) and its Sweetie Peck
2D injection well (the 2D well) caused the water flow in Discovery=s 15-6 well.  Therefore,
Discovery brought this suit against BP.








Discovery and BP designated experts on the
issues of negligence, causation, and damages, and all of these issues were
hotly contested.  The trial court conducted Daubert proceedings to
determine whether the designated experts were qualified to testify as expert
witnesses at trial.  During the Daubert proceedings, the trial court
heard testimony on eight days during a period of about four months.  The trial
court ruled that all of the witnesses who had testified during the Daubert
proceedings were qualified to testify as expert witnesses at trial.  The jury
trial was dominated by detailed, sophisticated, and complex expert testimony. 
The jury heard testimony on thirteen days.

The case involved the following central
issue:  What caused the water flow in the 15-6 well?  Discovery encountered the
water flow in the 15-6 well at a depth of 3,895 feet, which was either at the
base of the Seven Rivers formation or at the top of the Queen formation. 
Initially, Discovery believed that the water flow had been caused by BP=s injections into its 25
well and its 2D well.  The Texas Railroad Commission had issued permits
allowing BP to use these wells as injection wells.[4] 
With the 25 well, BP injected fluids into the War-San San Andres (WSSA)
reservoir, which was part of the San Andres formation, at a depth of about
6,100 feet.  With the 2D well, BP injected fluids into the San Andres formation
at a depth above the WSSA reservoir.

At trial, Discovery=s experts testified that BP=s injections into its 25
well caused the water flow in the 15-6 well.  Discovery did not offer expert
testimony that BP=s
injections into its 2D well caused the water flow in the 15-6 well, and the
trial court granted a verdict in BP=s
favor on Discovery=s
claims relating to the 2D well.  Thus, the primary disputed causation issue at
trial was whether BP=s
injections into its 25 well at a depth of about 6,100 feet in the WSSA
reservoir caused the water flow encountered by Discovery in its 15-6 well at a
depth of 3,895 feet in the Seven Rivers formation or the Queen formation.  BP=s 25 well was about a mile
away from Discovery=s
15-6 well.  BP injected sulfur water into its 25 well, which was much different
from the brine water that Discovery encountered in its 15-6 well.  However,
Discovery=s experts
contended that pressures and waters injected by BP into its 25 well had escaped
the interval allowed by the Railroad Commission permit for the well and had
moved pressures and brine water into the area where Discovery encountered the
water flow.  BP=s
experts disputed this contention.








                                                  Discovery=s Petition

Discovery alleged that, on April 17, 2003,
while drilling the 15-6 well, it encountered a strong flow of saltwater at a
depth of about 3,895 feet and that the water flow was caused by BP=s operations of its 25
well, its 2D well, or both wells.  With respect to its negligence cause of
action, Discovery alleged that BP owed and breached a duty to it Ato exercise reasonable care
to prevent its injected fluids from migrating from the approved injection
strata, and from entering and/or pressurizing intervals other than those
intervals permitted by the Texas Railroad Commission.@  With respect to its negligence per se cause
of action, Discovery alleged that, in operating the injection wells, BP
violated the terms of the Railroad Commission permits for the wells, Railroad
Commission Statewide Rules 9 and 46, and Sections 86.045 and 91.143 of the
Texas Natural Resources Code.  See 16 Tex.
Admin. Code '
3.9 (2004) (Tex. R.R. Comm=n,
Disposal Wells), ' 3.46
(2004) (Tex. R.R. Comm=n,
Fluid Injection Into Productive Reservoirs); Tex.
Nat. Res. Code Ann. '
91.143 (Vernon Supp. 2009).  Apparently due to a typographical error, Discovery
referred to Section 86.045 of the Natural Resources Code in its petition
instead of Section 85.045 or Section 85.046.  See Tex. Nat. Res. Code Ann. '' 85.045, 85.046 (Vernon
2001).  There is no Section 86.045 in the Natural Resources Code.  The record
shows that Discovery was asserting a negligence per se claim for a violation of
Section 85.045, which provides that waste is illegal and prohibited, based on
the definition of Awaste@ in Section 85.046. 
Therefore, we will refer to Section 85.045, Section 85.046, or both
sections in our discussion of Discovery=s
negligence per se claims.  With respect to its common-law and statutory waste
claims, Discovery alleged that BP=s
actions in operating Athe
[i]njection [w]ells in a manner that allowed the injected fluids to escape the
permitted intervals@
resulted in the Acharged
interval@ that
Discovery encountered and, therefore, caused the waste of hydrocarbons that
Discovery could have otherwise recovered.

Discovery alleged that it was entitled to
recover various elements of damages from BP, including the costs incurred in
bringing the 15-6 well under control after the water flow was encountered and
costs that would be incurred in the future to plug and abandon the well. 
Discovery also sought to recover damages A[for
the lost] value of the oil and gas that should have been produced from the 15-6
well.@

                                                           BP=s Plea in Abatement








BP filed a plea in abatement in the trial
court contending that the Railroad Commission had either exclusive or primary
jurisdiction over issues relating to whether it had violated Railroad
Commission rules, regulations, or permits in operating its injection wells. 
The trial court agreed with BP=s
position and entered an order on plea in abatement.  In the order, the trial
court stated Athat
exclusive jurisdiction lies with the Railroad Commission to make all
preliminary determinations of what, if any, Railroad Commission rules,
regulations or permits were violated.@ 
The trial court also stated that, if it had erred in concluding that the
Railroad Commission had exclusive  jurisdiction, then the Railroad Commission
had primary jurisdiction to make such determinations.  The trial court ordered
that the cause be abated Auntil
a ruling or rulings of the Railroad Commission can be had to determine what, if
any, violations of the Railroad Commission rules, regulations or permits have
occurred.@

Discovery filed a petition for writ of
mandamus in this court requesting that the order of abatement be vacated and
the referral to the Railroad Commission be withdrawn.  Relying on Tex. Nat. Res. Code Ann. '' 85.321, 85.322 (Vernon
2001), we held that the trial court had committed a clear abuse of discretion
in determining that the Railroad Commission had exclusive or primary
jurisdiction.  In re Discovery Operating, Inc., 216 S.W.3d 898, 905
(Tex. App.CEastland
2007, orig. proceeding).  Therefore, we conditionally granted Discovery=s petition for writ of
mandamus.  Id.  Later, the trial court entered an order rescinding its
order on plea in abatement.

                                                The Trial
Court=s Summary
Judgment

BP moved for a no-evidence summary judgment
on multiple grounds.  BP asserted that it was entitled to summary judgment on
Discovery=s negligence
per se claims because the statutes, rules, and permits relied upon by Discovery
in its pleadings did not provide a basis for imposing negligence per se
liability.  After holding a hearing on BP=s
motion for summary judgment, the trial court sent a letter to counsel for the
parties.  The trial court stated the following in the letter:

In determining whether or not to grant the motion for partial
summary judgment regarding negligence per se, Entex, 94 SW3d 1,[5]
tells me that when civil liability is based on a statute the standard of
conduct must be clearly defined in the statute and the injury must grow
directly out of a breach of that standard.  I am not clear which statute your
negligence per se cause of action refers to.  There is no 86.045 in the Natural
Resources Code.  I assume from the other briefing that is a typographical
error, but I need to know specifically on what section you intend to rely.

 

 








Discovery responded to the trial court=s letter by stating that the reference to
Section 86.045 was a typographical error and that the correct statute was
Section 85.046.

Later, the trial court entered an order Agranting in part and
denying in part [BP]=s
no-evidence motion for summary judgment.@ 
The trial court stated in the order Athat
[Discovery] has raised more than a scintilla of evidence on all but one point
challenged by [BP]=s
Motion for Summary Judgment.@ 
Following this statement, the trial court discussed Hicks v. Humble Oil
& Refining Co., 970 S.W.2d 90, 95 (Tex. App.CHouston [14th Dist.] 1998, pet. denied).  The
trial court stated that the Hicks court held Athat negligence per se was not applicable to a
violation of Railroad Commission regulation.@ 
The trial court explained that the prohibition against waste that was found in
the Railroad Commission rule involved in Hicks is now found in Section
85.046 of the Natural Resources Code.  Based on the reasoning in Hicks,
the trial court held that a failure to comply with Section 85.046 of the
Natural Resources Code does not constitute negligence per se.  Therefore, the
trial court granted BP=s
motion for summary judgment with regard to Discovery=s negligence per se claim based on alleged
violations of Section 85.046.  The trial court also severed the claim from the
other claims in the cause.  The trial court also stated that A[a]ll other claims in [BP]=s Motion for Summary
Judgment are denied.@ 
Discovery=s appeal in
Cause No. 11-08-00127-CV arises from the trial court=s order granting in part BP=s no-evidence motion for
summary judgment.

                                              The
Daubert Proceedings

Discovery presented the following witnesses
at the Daubert proceedings:  (1) Don L. Sparks, a petroleum engineer;
(2) Robert C. MacDonald, Ph.D., a petroleum engineer; (3) Coley Ronald Platt, a
petroleum engineer; (4) David C. Triana, a petroleum engineer; and (5) Joe C.
Neal, a petroleum engineer.  BP presented the following witnesses at the Daubert
proceedings:  (1) William D. Griffin, a petroleum engineer; (2)
Steven John Seni, Ph.D., a geologist; (3) Roy C. Williamson, a petroleum
engineer and a geological engineer; and (4) William M. Cobb, Ph.D., a petroleum
engineer.

We have reviewed the Daubert
testimony in its entirety.  While the testimony is helpful to understanding the
issues in the case, in the interest of brevity, we will not summarize it here. 
We will refer to the Daubert testimony in this opinion where necessary. 









Following the Daubert proceedings,
the trial court issued a letter ruling.  In the letter, the trial court
concluded that Aall
experts offered should be allowed to testify.@ 
The trial court found that the experts were qualified to testify and that, with
one qualification, their opinions were reliable and relevant.  The only
qualification was that Griffin in his testimony had characterized several zones
as AYates= et al,@ and the trial court stated
that A[t]he zones he
is designating >Yates= et al= should be called what they
are.@

                                                          Evidence
at the Jury Trial

Discovery presented twelve witnesses at trial;
BP presented nine witnesses at trial.  We have reviewed all the trial
testimony, and we will now summarize it.

Discovery=s Witnesses.

Don Sparks testified that BP=s 25 well was about a mile
away from Discovery=s
15-6 well and that, as such, BP and Discovery were offset operators to each
other.  TMBR/Sharp was the drilling company for Discovery on the 15-6 well. 
Don Sparks said that the drilling company prepares drilling records that are
kept on the rig until it is completed; these records are called Atour sheets.@  Don Sparks also said that
the drilling company sends daily reports to the operator.  During his
testimony, Don Sparks discussed the April 17, 2003 tour sheet for the 15-6
well.  The tour sheet showed that the water flow was encountered at 5:15 p.m.
at 3,895 feet and that, at that time, a pressure of 900 psi was measured on the
standpipe.  Don Sparks said that Discovery hit the water flow at the base of
the Seven Rivers formation or the top of the Queen formation.  He said that the
900-pound pressure that was measured on the standpipe was not measuring the pressure
coming from the bottom of the hole up or a flowing or shut-in pressure.  He
also said that, to measure a true bottom-hole pressure, you must have a closed
system in which the blowout preventers are shut in.  Don Sparks testified that
the first shut-in pressure measured after Discovery encountered the water flow
was 550 pounds and that this pressure number would be used to compute the
bottom-hole pressure.

Based on a lack of any similar problems in
the past, Don Sparks concluded that the water flow in the 15-6 well had not
been caused by Mother Nature.  Instead, he believed that it had been caused by
some type of man-made injection.  Don Sparks concluded that the pressures and
waters that Discovery encountered in the 15-6 well had been caused by BP=s 25 well (primary source)
and BP=s 2D well
(possibly a secondary source) injection sources.  Don Sparks testified that
water that had been injected from the source of the pressure B BP=s injection wells B had moved into another area, pressured water
that was already in the other area, and caused that water to move to the area
where Discovery encountered it.








Don Sparks testified that the industry
standard for the operation of injection wells is to maintain operations in such
a manner so as to prevent anything that would cause damage to any offset
operators.  Based on his review of BP=s
files, Don Sparks testified that water injected by BP had escaped the approved
interval.  He referred to such water as Aout
of zone.@  Don Sparks
also said that BP had record-keeping problems.  Based on BP=s objection, the trial
court ruled that Don Sparks could not testify on the issue of whether BP
violated the industry standard for operating injection wells.[6]

Don Sparks testified that he was not aware
of any major problems in the Yates formation in Midland County.  However, he
was aware that problems had occurred in the Yates formation in other counties. 
He testified that those problems were nothing like what Discovery encountered
in the 15-6 well.  Don Sparks also testified that Discovery had never sustained
a water flow coming from a blowout in the Yates formation.  He said that,
normally, high nitrogen comes out of a well when a Yates blow occurs and that a
Yates blow is generally a short-lived problem.  He also said that Discovery had
drilled through the Yates formation when it encountered the water flow in the
15-6 well.

Earl Michie, a petroleum engineer, testified
that his company, Terrace Petroleum, drilled the Terrace Peck 21-3 well. 
Michie testified that drilling operations commenced on the 21-3 well on March
27, 2005.  Michie said that, during drilling, at a depth of about 3,850 feet,
Terrace Petroleum encountered a significant water flow.  He said that, to
obtain a shut-in pressure on a well, the well has to be physically shut in. 
Michie testified that, after Terrace Petroleum shut in the 21-3 well, the
standpipe on the well measured 625 pounds shut-in pressure.  Michie testified
that, before drilling the 21-3 well, he had never encountered such a water flow
in the area.  Michie said that the water flow encountered in the 21-3 well had
no similarities to a Yates air blow.  He said that he had never encountered a
Yates blow in the area where the 21-3 well was drilled.  He also said that a
Yates blow is gaseous in nature and does not have a liquid flow.








Dr. MacDonald testified that he investigated
the waterflood projects that were located within about a five-mile radius of
the 15-6 well.  As part of his investigation, he studied the War-San project,
which contained BP=s
25 well.  He also studied ten other waterflood projects that were located in
four reservoirs, including the Pegasus San Andres reservoir, the Moose Queen
reservoir, the Concho Bluff Queen reservoir, and the Concho Bluff North Queen
reservoir.  Dr. MacDonald testified that he compared the amount of water that
had been injected into the project areas with the amount of oil and water that
had been produced from those areas.  Dr. MacDonald testified that, the higher
the injection-to-production ratio, the more likelihood that water is out of
zone.  Dr. MacDonald prepared a graph showing the injection-to-production
ratios (cumulative injection in barrels of water divided by the cumulative
production of barrels of oil plus water) for the projects.  He testified that,
with respect to projects other than the War-San project, the
injection-to-production ratios remained relatively constant from 1975 forward. 
Considering that (1) the injection-to-production ratio of the War-San project
was 3.5 to 1, (2) the injection-to-production ratios of the other projects, the
maximum of which was 1.7 to 1, had remained constant for a number of years, and
(3) the other projects were somewhat distant from the 15-6 well, Dr. MacDonald
testified that he had eliminated the other projects as possible candidates for
the water flow encountered by Discovery in the 15-6 well.

Dr. MacDonald also testified that he
conducted a material balance study of the WSSA reservoir.  Dr. MacDonald=s calculations indicated
that the reservoir contained 140 million barrels of pore volume, which he said
was the available volume in which liquids and gases could reside.  Dr.
MacDonald characterized the WSSA reservoir as a Apot@ or a contained reservoir. 
He said that one would expect a reservoir=s
pressure to increase as injection occurs but that the pressure will not
increase if the reservoir leaks.  Based on his study, Dr. MacDonald testified
that pressure had leaked from the WSSA reservoir into the Queen formation.  Dr.
MacDonald said that the total injection into the WSSA reservoir had been about
16 million barrels, that total production from the reservoir had been about 5
million barrels, and that, therefore, about 11 million more barrels had been
injected than had been produced.  In Dr. MacDonald=s opinion, the WSSA reservoir could not
contain the amount of fluids that had been injected into it.  Dr. MacDonald
testified that the WSSA reservoir reached an injection-to-production ratio of
about 1 to 1 in January 1989 and, later, became significantly over-injected. 
He said that the WSSA reservoir Apressured
up at one time in the nineties and leaked@
and A[t]hat=s what caused the pressure
in the other zones.@ 
Dr. MacDonald testified that, in his opinion, the water injection into the 25
well was the source of the water flow in the 15-6 well.








Platt testified that the WSSA reservoir was
a distinct reservoir within the San Andres formation.  Platt said that, in
investigating the water flow in the 15-6 well, he conducted research on
forty-six wells that were drilled in the area before 1960.  He said that these
wells had been drilled before water injection was taking place in the area. 
Based on his investigation, Platt concluded that the pressurized water
encountered by Discovery below the 15-6 well was not the result of a natural
occurrence.  He based his conclusion on the following:  (1) the wells drilled
in the area before water was injected had not encountered water flow problems
and (2) his experience in the area.

Platt testified that Discovery studied water
injection projects other than the War-San project in an attempt to eliminate
them as potential sources of the water flow in the 15-6 well both (1) by the
distance that they were away from the 15-6 well and (2) by a study of their
injection-to- production ratios.  Platt explained that, the farther away an
injection project was from the 15-6 well, the less likely that project was the
source of the problem in the 15-6 well.  He testified that, in his opinion, the
other projects, which were four to five miles away from the 15-6 well, were not
the source of the pressure increase in the 3,900-foot zone that resulted in the
water flow in the 15-6 well.  Platt concluded that Discovery had eliminated the
other injection projects as sources of the water flow in the 15-6 well.

Platt testified that, in his opinion,
pathways existed for pressure communication between BP=s 25 well and Discovery=s 15-6 well.  He prepared a schematic drawing
demonstrating potential pathways that involved the 25 well, the 9 well, the 26
well, and the 15-6 well.  A copy of the drawing, which was entitled APathways for Pressure
Communication Between Sanders A-25 and Water Flow Encountered in Geronimo 15-6
Well@ was introduced
into evidence.  Platt testified that the injection pressures used by BP in the
25 well were high enough to cause the pressures encountered by Discovery in the
3,900-foot zone below the 15-6 well.  He said that, in his opinion, the
over-injection of water into the WSSA reservoir by the 25 well caused the water
flow in the 15-6 well.  He also said that the 900 psi measured on the standpipe
during the water flow was not the shut-in pressure on the 15-6 well.








Jeff Sparks, who is a petroleum engineer
with Discovery, testified that he prepared drilling prognoses for the wells
that Discovery drilled on the Geronimo lease.  Before Discovery drilled its
wells on the Geronimo lease, Jeff Sparks conducted a records search relating to
wells that had been drilled in the area.  He testified that his search showed
that there had never been any water flow problems in the area.  He also
testified that Discovery had never encountered a problem in the Yates formation
in Midland County.

Neal testified that Don Sparks requested him
to perform a peer review of the depositions of the expert witnesses in the case
and to prepare an engineering evaluation of what would have been recovered from
the 15-6 well had it been completed as a producing well.  Neal testified that
Discovery=s experts
did not use any unusual procedures or practices to develop their conclusions
and that they used standard and reliable procedures in performing their
engineering evaluations.  He also testified that he prepared a reserve study
for the 15-6 well.  Neal concluded that the well would have produced about
90,000 barrels of oil and 198,000 mcf of gas and that Discovery=s net revenue from the well
would have been $2,865,495, or $1,748,514 if discounted at a 10% rate.

BP=s
Witnesses.

Steven Lee Rowell was a toolpusher for
TMBR/Sharp, the drilling company for Discovery on the 15-6 well, when the water
flow was encountered on the well.  Rowell testified that he was in the
toolpusher=s trailer
house when the water flow was encountered.  He said that he went to the rig
floor after being informed of the water flow.  He testified that he read a
pressure of 900 psi on the standpipe after the mud pumps had been Akicked out.@  Rowell wrote  A[w]ell flowing with 900 psi@ on the tour sheet.  Rowell
testified that, normally, when the mud pumps are kicked out, the standpipe
pressure will go to zero.  He said that the pressure was not coming from the
pump and that, therefore, it would have been coming from downhole.  He also
said that, when the well was flowing, the blowout preventers were open.

Rowell also testified that brine water was
flowing from the well.  He said that he had never seen anything like the water
flow in the 15-6 well in Midland County.  Rowell testified that he had
experienced Yates air problems in the past.  He said that the water flow in the
15-6 well did not resemble in any way what he had experienced with Yates air
blows.

Anthony Ray Aguilar, a BP employee,
testified that the water BP injected into the 25 well was really black and
stunk really bad.  He said that he took a daily reading on the amount of water
injected and that he wrote down this information.  He testified that he never
saw a shut-in pressure on the 25 well that was as high as 900 pounds.








Stephen Christopher Boger was an employee of
the Railroad Commission.  BP presented his testimony by deposition.  Boger had
a degree in geological sciences.  He testified that, based on his experience,
it was not possible that 650 pounds of pressure at BP=s injection well could have caused 900 pounds
of pressure in Discovery=s
15-6 well a mile away.  Boger believed that there was no correlation between BP=s injection wells and the
water flow in Discovery=s
15-6 well.  Boger also testified that Joe Millhollon, another Railroad
Commission employee, saw no relationship between BP=s injection wells and Discovery=s 15-6 well.  BP also
presented Millhollon=s
testimony by deposition.  Millhollon concluded that, based on his review of
well-monitoring charts, no relationship or correlation existed between BP=s injection wells and
Discovery=s 15-6 well.

Griffin testified about the April 17, 2003
tour sheet for the 15-6 well.  The tour sheet indicated that, between 4:30 p.m.
and 5:15 p.m., Discovery drilled from 3,878 feet to 3,895 feet and that, at
3,895 feet, Discovery hit a brine flow.  Griffin testified that, from 5:15 p.m.
to 7:30 p.m., the well was flowing with 900 pounds of pressure on the
standpipe.  The following exchange took place during additional questioning by
BP=s counsel about
entries on the tour sheet:

[BP=S
COUNSEL]: All right.  And then at 7:30, what did they do, that evening?

 

[GRIFFIN]: At 7:30, they started drilling again.  As you can
see, [the tour sheet] says, ADrilling
with flow from 3,913 feet to 3,988 feet.@


 

[BP=S
COUNSEL]: All right.  Now, Mr. Griffin, there is a difference between where
they stopped drilling at 3,895 and where they started drilling at 3,913, of
some 18 feet.

 

[GRIFFIN]: That=s
correct.  You can see this is where they stopped drilling at 3,895 feet, and
then the next B when
they started drilling again was 18 feet deeper at 3,913 feet.

 

[BP=S
COUNSEL]: And what does that indicate?

 

[GRIFFIN]: That indicates they didn=t need to drill.  They hit a cavern or
extremely soft formation or something like that down there, more likely a
cavern.

 

[DISCOVERY=S
COUNSEL]: Your Honor, please, I object to Mr. Griffin speculating about what
that means.  It is not on the [tour sheet].  Nobody else has testified who was
on the well.  And that=s
pure speculation. 

 

[THE COURT]: Just a minute.  I=ll
overrule the objection and let you question him about it on cross.  

                         

[BP=S
COUNSEL]: So that there is an area there that=s
about 18-foot thick, Mr. Griffin, that is either real high porosity or it=s a cavern or something
that they didn=t have
to drill through?

 








[GRIFFIN]: Something awful soft or a cavern that just the
weight of the bit just dropped through it.

 

[BP=S
Counsel]: And if it was, in fact, a cavern there, would that sort of support
the 1,500 barrels per hour of flow that was reported coming out of this well?

 

[DISCOVERY=S
COUNSEL]: If your Honor please, that is pure speculation.  Again, he is not
going to base an opinion upon speculation as to what B there has been no predicate laid that they
didn=t record B why did they not record
the 18 feet?

 

There is nothing in here about a cavern.  There is nothing in
here about lost circulation.  It doesn=t
say lost circulation.  Most of the drilling reports, when they lose
circulation, will say that. 

 

I renew the objection.  I don=t
think he is entitled to offer an opinion about that.

 

[THE COURT]: I=ll
overrule the objection.

 


[BP=S
COUNSEL]: Now, if I understand, we are not talking about lost circulation.  We
are talking about a flow coming into the well at this interval, aren=t we, Mr. Griffin?

 

[GRIFFIN]: That=s
correct. [Discovery=s
counsel] is correct.  I don=t
see any indication of lost circulation up there at all.  I just see that they
didn=t have to drill
and the bit dropped 18 feet when they went back in the well. 

                                        

Griffin also testified that the presence of a cavern under
the 15-6 well would account for a very rapid evacuation of fluids from that
zone.  During cross-examination, Griffin acknowledged that the tour sheet did
not state that the Abit
dropped,@ but he said,
A[T]hat=s what happened.@  Griffin also said that,
if inconsistencies existed between the tour sheet and the morning report, he
would trust the tour sheet because it was filled out as drilling occurred.








Griffin also testified that, in his opinion,
the water flow in the 15-6 well was caused by a Yates air blow.  He said that
the Yates air blow was caused by a partial collapse of the supporting matrix at
3,900 feet.  Griffin explained the concept of Aoverburden
rock.@  He said that,
if you are at a depth of 3,900 feet, Aoverburden
rock is everything above [that depth], and whatever it weighs.@ He also said that, when
gypsum converts to anhydrite, a 39% reduction in rock volume has occurred. 
Griffin testified that, when the collapse of the overburden is more severe,
water flows and blowouts similar to what happened in the 15-6 well will occur. 
In Griffin=s opinion,
compressed nitrogen drove the water out of the 15-6 well.  He said that the gas
that was associated with the water flow in the 15-6 well Awas almost all nitrogen.@  He said that the water
flow in the 15-6 well was similar to what had happened during Yates air flows
in Wasson Field wells in Yoakum County.

Griffin also testified about Discovery=s potential pathways for
water and pressure to migrate from BP=s 
25 well to Discovery=s
15-6 well.  He said that, with respect to the 26 well, if water entered the
wellbore at a depth of 6,100 feet, it could not go up to the 3,900-foot level
because the 26 well had a cement plug in it from 5,825 feet to 6,000 feet and
another cement plug in it at around 5,200 feet.  He said that Discovery=s pathway assumed that the
cement plugs in the well did not exist.  Griffin also said that other wells
contained plugs and, therefore, could not be pathways from the 6,100-foot
interval to the 3,900-foot interval.  In Griffin=s
opinion, no single wellbore could have acted as a pathway for migration of
water or pressure from the 6,100-foot interval to the 3,900-foot interval.

In Griffin=s
opinion, injection into BP=s
25 well did not cause the water flow in Discovery=s
15-6 well because the pressure in the 25 well was lower than the pressure in
the 15-6 well.  Griffin said that, had the 25 well been connected to the 15-6
well at the time of the water flow, the measured shut-in pressure in the 15-6
well would have been the same as the shut-in pressure in the 25 well (260 pounds). 
Griffin=s theory of a
lack of communication between the two wells was based on an application of
Pascal=s law.

            Williamson testified about Discovery=s potential pathways for
migration of fluids and pressures from BP=s
25 well to Discovery=s
15-6 well.  In Williamson=s
opinion,  fluids could not have moved in any of the wellbores around the 25
well and the 15-6 well from the 6,100-foot level to the 3,900-foot level.  He
said that adequate pipe and cement existed in the wellbores to prevent such
migration.  Williamson testified that Discovery contended, if the cement plugs
in the 26 well had not held, the 26 well by itself would have served as a
conduit or a pathway from the 6,100-foot level to the 3,900-foot level. 
Williamson said, however, that there was no evidence that the plugs had not
held.








Williamson performed a study to ascertain
whether or not there was an area of porous interval in the San Andres formation
around BP=s 25 well
and Discovery=s 15-6
well.  Based on his study, Williamson determined that the San Andres formation
contained 10.179 billion barrels of porous rock.  Williamson testified that he
later corrected his calculations to account for the possible existence of shale
in the formation.  He said that taking into account the possibility that shale
existed in the formation reduced his calculation as to storage capacity in the
San Andres formation from 10.179 billion barrels to 6.126 billion barrels. 
Thus, in Williamson=s
opinion, the San Andres formation contained a very large area of storage
capacity and was large enough to contain the water that had been injected into
it.

BP=s
counsel asked Williamson whether he prepared a factual study of the surrounding
Queen injection projects that Dr. MacDonald had excluded as possible causes of
the water flow in the 15-6 well.  Over Discovery=s
objections, the trial court permitted Williamson to testify about his study of
the Queen projects.  Williamson testified that he prepared graphs summarizing
information that he obtained from Railroad Commission H-10 forms relating to
the surrounding injection projects.  BP introduced the graphs into evidence. 
In the graphs, Williamson showed the amount of water that had been injected in
the projects and the pressures that had been used to inject the water. 
Williamson testified about the average surface injection pressures shown on the
graphs.  In summary, Williamson=s
testimony showed that the average surface injection pressures in the Queen
projects were much higher (such as 2,000 psi and 2,500 psi) than the injection
pressures in BP=s 25
well.

Williamson also testified that he performed
a reserve study and a cash analysis for the 15-6 well.  He projected a net
revenue for the well in the amount of $578,111, which discounted at the rate of
10% equaled $134,092.

Dr. Seni testified that BP=s 25 well was permitted
under Rule 46 as an injection well.  He said that BP=s injection took place in the War-San Field
and that the approved strata for injection was the entire San Andres
formation.  Dr. Seni said that the permit for the 25 well did not require the
injected water to be confined to a strata at the depth interval from 6,070 to
6,170 feet.  He said that the depth interval from 6,070 to 6,170 feet was
simply where injection was required to take place.  Dr. Seni testified that, in
his opinion, there was no evidence indicating that fluids injected by BP had
escaped the approved strata.

Dr. Seni also testified that a main
characteristic of a confined reservoir is the presence of high pressures.  He
said that a confined reservoir is not surrounded by and attached to a larger
water aquifer and, therefore, has a potential water drive.  Dr. Seni said that
the WSSA reservoir had hydrostatic or lower than hydrostatic normal pressures
and only a slight water drive, which were not characteristics of a confined
reservoir.








Dr. Cobb testified that Pascal=s law is as follows: AIn a closed system, a
pressure change produced at one point in the system will be transmitted
throughout the entire system.@ 
Based on an application of Pascal=s
law, Dr. Cobb concluded that BP=s
25 well and Discovery=s
15-6 well were not in communication.  He said that the shut-in pressure on the
25 well was 260 psi and that the injected water weighed 9 pounds per gallon. 
Dr. Cobb testified that Discovery indicated that the water flow in the 15-6
well consisted of 10-pound brine water.  Dr. Cobb performed an analysis using a
260 psi shut-in pressure at the 25 well and a 550 psi shut-in pressure at the
15-6 well.  He testified that, under these conditions, communication between
the wells could not exist because the pressures were not the same and that, if
the wells were somehow connected, water should be moving from the 15-6 well
toward the 26 well and then toward the 25 well.  Dr. Cobb also performed an
analysis using an injection pressure of 520 pounds at the 25 well and a flowing
pressure at the surface of the 15-6 well of 900 pounds.  Based on his analysis,
he testified that he did not believe that the wells could have been in
communication and that, if the wells were in communication, the water should
have been moving from the 15-6 well toward the 25 well.  Based on his studies,
Dr. Cobb did not believe that BP=s
injection into the 25 well caused the water flow that Discovery encountered in
the 15-6 well because the pressures in the wells A[did
not] match.@

Dr. Cobb testified that, in an ideal world,
Pascal=s law requires
that everything be static in a system.  In this case, he assumed that the
pressures were in static communication with each other.  He said that, when things
are dynamic, Pascal=s
law provides a very good estimate for what the end result would be in a static
condition.  He also said that this case did not involve Aa perfectly static system.@

Dr. Cobb testified that he analyzed Dr.
MacDonald=s material
balance study of the WSSA reservoir.  Dr. Cobb said that Dr. MacDonald assumed
that the water in the aquifer and the oil in the oil reservoir reacted
instantaneously and that, therefore, if the pressure changed in the oil
reservoir, an instantaneous pressure change would occur in the aquifer in the
same amount.  In Dr. Cobb=s
opinion, based on the conditions in the War-San San Andres Field, Dr. MacDonald=s assumption was invalid. 
Dr. Cobb explained that instantaneous transmission of pressure is a reasonable
assumption only if the dimension of the aquifer is of the same order of
magnitude as the dimension of the reservoir and that, in this case, the oil
reservoir and the aquifer were not of the same order of magnitude.








Dr. Cobb testified that he performed work
concerning the surrounding Queen floods.  Over Discovery=s objections, the trial court permitted Dr.
Cobb to testify about injection pressures that had been used in the surrounding
Queen floods.  Dr. Cobb testified that he summarized Railroad Commission
production and injection data by fields.  He testified that, between July 1999
and July 2004, the Jennifer Queen Unit Number 8 injected at a surface injection
pressure, on average, of 2,200 psi.  Dr. Cobb=s
testimony showed that other wells in the Queen floods injected at similar
pressures.  By way of comparison, Dr. Cobb said that the surface injection
pressure in BP=s 25
well during the same period of time ranged from about 900 to 950 psi.  Dr. Cobb
converted the surface shut-in pressures for the Queen projects to bottom-hole
pressures.  He then calculated pressure gradients for the projects by taking
the bottom-hole pressures and dividing those pressures by the depths of the
projects.  Dr. Cobb testified that the pressure gradient for the Concho Bluff
Queen project was 1.01 psi per foot, that the pressure gradient for the Concho
Bluff North Queen project was 1 psi per foot, and that the pressure gradient
for the Moose Queen project was 0.96 psi per foot.  By way of comparison, Dr.
Cobb said that the pressure gradient for the War-San project was 0.604 psi per
foot.  Dr. Cobb testified that, in his experience, Awhen the pressure gradient exceeds about .7 to
.75, you are very near, if not perhaps above, the fractured pressure of the
reservoir.@  He said
that injecting at a pressure above the fracture pressure creates cracks in the
rock and allows the water to move in paths that were previously not available. 
However, Dr. Cobb testified that he had no evidence that the operators of the
Queen projects had fractured the formations into which they were injecting.

Dave McKenna testified as the corporate
representative for BP.  McKenna testified that, on September 10, 2003, he had a
meeting with Don Sparks, Kevin Sparks, and Jeff Sparks about Discovery=s 15-6 well.  McKenna said
that, after the meeting, Berry Simpson, who was a contract production engineer
for BP, concluded that BP=s
injection wells did not cause the problem in Discovery=s 15-6 well.  McKenna testified that most of
the water that was injected into the 25 well was from the Ellenburger
formation.  He said that Ellenburger water was sour and black and smelled
strongly of H2S.  McKenna had heard that clear brine water had flowed out of
Discovery=s 15-6 well.

Discovery=s Rebuttal Witnesses.

Platt testified about the pressure data that
he used in concluding that pressure communication existed between the 25 well
and the 15-6 well.  He said that Dr. Cobb had criticized the pressures he used
in making his calculations.  Platt testified that he used a 940 psi injection
pressure for the 25 well.  He said that BP had reported the 940 psi pressure in
a Railroad Commission H-10 form and that the H-10 form corresponded with
pressure information in BP=s
records.  Platt said that he converted the 940 psi injection pressure to a
shut-in pressure of 590 psi.  Platt testified that, A[u]sing the 590, it shows pressure
communication from the 25 to the 15-6.@








Platt also testified that he and Dr.
MacDonald looked at all the data, including surface injection pressures,
relating to the Queen projects, when they concluded that the Queen projects
could be eliminated as a cause of the water flow in the 15-6 well.  Platt said
that he and Dr. MacDonald had no reason to believe that the operators of
the Queen projects had fracked the formation or that the Queen projects had
water out of zone.

Don Sparks testified that the 900 psi
measurement on the 15-6 well=s
standpipe gauge was not an appropriate number by which to calculate a flowing
bottom-hole pressure.  He said that, to obtain a shut-in drillpipe pressure,
the blowout preventers must be closed.  Don Sparks said that, when the 900 psi
was measured on the standpipe gauge, the blowout preventers were open.  He said
that, unless there is a problem, the standpipe gauge measures the pressure that
is going down the hole.  Don Sparks testified that, after the system was shut
in, the 15-6 well had shut-in pressures ranging from 400 psi to 550 psi.

Don Sparks also testified about Griffin=s Acavern@
testimony.  He said that the tour sheets are kept by the drilling company until
the job is finished.  He also said that the drilling company provides Discovery
with a morning report each day during drilling.  Don Sparks testified that the
April 18, 2003 morning report did not indicate that there was an 18-foot gap in
drilling the 15-6 well.  He said that, instead, the morning report showed that,
from 7:30 p.m. to 9:00 p.m., TMBR/Sharp Adrilled
with flow from 3,895 to 3,988.@ 
He also said that nothing on the morning report indicated that the drill bit
fell or that a cavern was encountered.  Don Sparks testified that he had never
seen a drill bit drop eighteen feet and that, if a drill bit fell that far, it
would shake the whole location.

                                                         The
Verdict and Judgment

The trial court granted a directed verdict
to BP on Discovery=s
claims relating to BP=s
2D well.  The trial court submitted a broad-form negligence question to the
jury:

QUESTION NO. 1:

Did the negligence, if any, of B.P. America Production
Company, in its operations of the Sanders A-25 saltwater injection well
proximately cause the uncontrolled water flow in the Discovery Operating, Inc.
Geronimo 15-6 well?   

 

In a ten-to-two verdict, the jury answered Ano@ to Question No. 1.  The jury did not answer
Question No. 2, the damages issue, because it was conditioned on a Ayes@ answer to Question No. 1.  Based on the jury=s verdict, the trial court
entered a take-nothing judgment against Discovery.








Discovery filed a motion for new trial that
was based, in part, on the admission of Griffin=s
Acavern@ testimony.  Discovery
filed an affidavit from Rowell, the toolpusher on the 15-6 well, in support of
the motion.  Rowell stated the following in his affidavit:  that the water flow
was encountered at 3,895 feet; that, at 7:30 p.m., they resumed drilling with
the flow at 3,895 feet as the morning report indicated; that no soft spot or
cavern was encountered in the drilling of the well; that the drill bit did not
drop eighteen feet; that the unexpected water flow and resulting confusion
apparently resulted in the error (failure to log eighteen feet of drilling) in
the IADC Report (tour sheet); that, in preparing the morning report, he noted
the discrepancy and made the necessary correction; and that the morning report
was accurate.

           Discovery=s
motion for new trial was overruled by operation of law, and Discovery filed its
appeal in Cause No. 11-08-00171-CV.  In its appeal, Discovery contends that the
trial court committed four errors in making evidentiary rulings and that the
errors require a reversal of the judgment and a remand of the case for a new
trial.

                       Discovery=s Negligence Per Se Claims B Cause No. 11-08-00127-CV

Discovery=s
negligence per se claims were based on BP=s
alleged violations of two statutes (Sections 85.045 and 91.143 of the Natural
Resources Code), two Railroad Commission Statewide Rules (Rules 9 and 46), and
the Railroad Commission permits for the 2D and 25 wells.  Section 85.045
prohibits waste in the production, storage, or transportation of oil and gas. 
Section 91.143 prohibits filing false applications, reports, and documents
with the Railroad Commission and tampering with gauges.  Rule 9 applies to
operations of disposal wells.  Rule 46 applies to operations involving fluid
injection into productive reservoirs.  Discovery alleged that BP=s violations of these
statutes, rules, and permits constituted negligence per se.

BP filed a no-evidence and supplemental
no-evidence motion for summary judgment based on a number of grounds.  In one
ground, BP asserted that there was no evidence that it had committed conduct
constituting negligence per se.  In its order, the trial court found Athat [Discovery] has raised
more than a scintilla of evidence on all but one point challenged by [BP]=s Motion for Summary
Judgment.@  The Aone point@ referred to in the trial
court=s order related
to BP=s challenge to
Discovery=s negligence
per se claims.  Although the trial court found that a lack of evidence existed
on Aone point,@ the trial court decided
the issue on a point of law.  Specifically, the trial court, relying on Hicks,
held that a failure to comply with Section 85.046 of the Natural Resources Code
does not constitute negligence per se.








                                                      Review
of Summary Judgment

In its sole issue on appeal in Cause No.
11-08-00127-CV, Discovery asserts that the trial court erred in granting
summary judgment on its negligence per se claims.  BP asserts that the trial
court=s order granting
summary judgment was limited to Discovery=s
claim under Section 85.046 and did not grant summary judgment to it on
Discovery=s other
negligence per se claims.  We disagree with BP for two reasons.  First, the
trial court, in granting summary judgment, relied on Hicks for the
proposition Athat
negligence per se was not applicable to a violation of [a] Railroad Commission
regulation.@  Thus,
the trial court=s
reasoning for granting summary judgment applied equally to all of Discovery=s negligence per se
claims.  Second, the record in Cause No. 11-08-00171-CV shows that the trial
court and the parties understood that the order granting summary judgment
disposed of all Discovery=s
negligence per se claims.  During the jury trial, one of BP=s lawyers made the
following statement at the bench:  AI
thought that we had been very careful that we weren=t going to talk about rule compliance or rule
noncompliance, because negligence per se is not in this case.@  Similarly, counsel for
Discovery and BP both made statements during a hearing on motions in limine
that Anegligence per
se is out of the case.@ 
We conclude that the trial court=s
order granted summary judgment to BP on all of Discovery=s negligence per se claims.

When the trial court ruled on BP=s motion for summary
judgment, it did so without the benefit of the Texas Supreme Court=s recent opinion in Emerald. 
The Texas Supreme Court issued its opinion in Emerald after the parties
filed their appellate briefs in these appeals.  In that case, Emerald, the
current mineral lessee, encountered unexpected problems when it attempted to
reenter wells that had been plugged and abandoned by Exxon, the former mineral
lessee.  2009 WL 795760, at *1.  Emerald sued Exxon, alleging that Exxon had
caused the problems by improperly plugging and intentionally sabotaging the
wells.  Emerald alleged the following claims, among others, against Exxon: (1)
that Exxon violated a statutory duty under Tex.
Nat. Res. Code Ann. '
89.011 (Vernon Supp. 2009) to plug a well properly; (2) that Exxon violated a
statutory duty under Section 85.045 of the Natural Resources Code to not commit
waste; and (3) that Exxon engaged in conduct constituting negligence per se. 
Emerald asserted that Exxon violated Section 89.011 of the Natural Resources
Code by violating Railroad Commission Statewide Rule 14 regulating plugging of
wells.  Id. at *1; see 16 Tex.
Admin. Code '
3.14 (2007) (Tex. R.R. Comm=n,
Plugging).








In Emerald, the Texas Supreme Court
first addressed whether Section 85.321 of the Natural Resources Code created a
private cause of action for the claims asserted by Emerald.  Section 85.321
provides, in part, as follows:

A party who owns an interest in property or production that
may be damaged by another party violating the provisions of this chapter that
were formerly a part of Chapter 26, Acts of the 42nd Legislature, 1st Called
Session, 1931, as amended, or another law of this state prohibiting waste or a
valid rule or order of the commission may sue for and recover damages and have
any other relief to which he may be entitled at law or in equity.

 

The Texas Supreme Court held that the clear language of
Section 85.321 creates a private cause of action for damages resulting from
violations of (1) provisions of Chapter 85,[7]
(2) other laws of this state prohibiting waste, and (3) valid rules and orders
of the Railroad Commission.  The court explained that, while the first two
categories refer to claims for waste, the third category is not so limited. 
Thus, a violation of any Railroad Commission rule or order triggers the third
category of actions.  2009 WL 795760, at *4.

After concluding that Section 85.321 creates
a private cause of action, the Texas Supreme Court then addressed whether
Emerald=s status as a
subsequent mineral lessee impacted its standing to bring a cause of action
under Section 85.321.  The court explained that, in Section 85.321, the
legislature had provided a private cause of action to a person who Aowns an interest . . . that
may be damaged by another party violating the provisions of this chapter.@  Id.  Based on this
language and applying the common-law principle that a purchaser of real
property cannot recover for an injury to the property that occurred before he
acquired his interest, the court concluded that Emerald lacked standing to
bring a cause of action under Section 85.321 because it did not own an interest
in the mineral leases when Exxon allegedly damaged the interest.  Id. at
*5.  The court briefly addressed Emerald=s
negligence per se claim.  The court concluded that, A[b]ecause our holding that a subsequent lessee
has no standing to bring a claim under section 85.321 stems from common law
principles, Emerald lacks standing to bring a negligence per se claim for the
same reasons.@  Id.
at *6.








Emerald stands for two propositions: 
(1) that Section 85.321 creates a private cause of action; and (2) that the
private cause of action does not extend to subsequent lessees.  The Texas
Supreme Court has granted Emerald=s
motion for rehearing relating to the second proposition.  The second proposition
does not apply to Discovery=s
claims because it is not a subsequent lessee.  Instead, Discovery owned the
mineral interests when the alleged injury occurred.  Based on the Texas Supreme
Court=s holding in Emerald,
Discovery has the right under Section 85.321 to assert its negligence per se
claims against BP, whether the claims are labeled as a private cause of action
for violations of statutes and Railroad Commission rules and orders or as
negligence per se claims for violations of the same statutes, rules, and
orders.

The trial court erred in granting summary
judgment to BP on Discovery=s
negligence per se claims.  On remand, Discovery will be able to plead its
claims in accordance with the Texas Supreme Court=s
opinion in Emerald.

BP contends that Discovery waived its
complaint that the trial court erred in granting summary judgment because
Discovery failed to plead a cause of action under Section 85.321 or to raise
Section 85.321 in its response to BP=s
motion for summary judgment.  Texas follows a Afair
notice@ standard for
pleading in which courts assess the sufficiency of pleadings by determining
whether an opposing party can ascertain from the pleading the nature, basic
issues, and the type of evidence that might be relevant to the controversy.  Low
v. Henry, 221 S.W.3d 609, 612 (Tex. 2007); Horizon/CMS Healthcare Corp.
v. Auld, 34 S.W.3d 887, 896 (Tex. 2000).  A petition is sufficient if it
gives fair and adequate notice of the facts upon which the pleader bases its
claim.  The purpose of this rule is to give the opposing party sufficient
information to enable it to prepare a defense.  Horizon/CMS Healthcare,
34 S.W.3d at 897; Roark v. Allen, 633 S.W.2d 804, 810 (Tex. 1982).








Discovery did not specifically refer to Section
85.321 in its petition or in its response to BP=s
motion for summary judgment.  However, Discovery alleged in its petition that
it owned the mineral leasehold.  Discovery also identified the specific
statutes and rules that it contended BP had violated.  Discovery also alleged
that it had been damaged as a result of BP=s
violations.  The facts alleged by Discovery were sufficient to give BP fair and
adequate notice of a claim under Section 85.321.  See Zavala v. Trujillo,
883 S.W.2d 242, 249 (Tex. App.CEl
Paso 1994, writ denied) (Although the appellant did not specifically plead a
violation of a statute, his allegations were sufficient to impart fair notice
to the appellee that he intended to rely on the statute to impose liability.); Ransopher
v. Deer Trails, Ltd., 647 S.W.2d 106, 110 (Tex. App.CHouston [1st Dist.] 1983, no writ) (Although
the appellee=s
pleadings lacked a specific statutory reference, they were sufficient because
they provided fair notice of the issues to be tried.).  In addition, Discovery
presented summary judgment evidence in support of its claims that BP had
violated the statutes, Railroad Commission rules, and the permits for the 2D
and 25 wells.  We also note that Section 85.321 was central to the outcome of
the earlier mandamus proceeding in this court.  See In re Discovery
Operating, 216 S.W.3d at 902-05.  Discovery met the fair-notice pleading
requirement.  Therefore, Discovery did not waive its complaint that the trial
court erred in granting summary judgment.

BP contends that the trial court properly
exercised its discretion in concluding that a violation of Section 85.046 does
not constitute negligence per se because (1) Section 85.046 fails to set forth
specific standards of conduct necessary for the imposition of negligence per se
liability and (2) it is not penal in nature.  For these same reasons, BP also
contends that Section 85.321 will not support a negligence per se claim. 
Therefore, BP argues that the trial court did not err in granting summary
judgment.

BP relies on Perry v. S.N., 973
S.W.2d 301, 304 (Tex. 1998), to support the proposition that determining
whether a particular statute will support a negligence per se claim is a matter
within the discretion of the court.  Negligence per se is a common-law doctrine
that allows courts to rely on a penal statute to define a reasonably prudent
person=s standard of
care.  Reeder v. Daniel, 61 S.W.3d 359, 361-62 (Tex. 2001).  The mere
fact that the legislature adopts a criminal statute does not mean that the
courts must accept it as a standard for civil liability.  Perry, 973
S.W.2d at 304.  In Perry, the court explained that the adoption of
criminal statutes into tort law is a matter of judicial discretion.  Id. 
The threshold questions in every negligence per se case involving a penal
statute are whether the plaintiff belongs to the class that the statute was
intended to protect and whether the plaintiff=s
injury is of a type that the statute was designed to prevent.  Id. at
305.  If a plaintiff satisfies these threshold questions, the court must
determine whether it is appropriate to impose negligence per se liability for
violations of the statute.  In Perry, the Texas Supreme Court identified
five nonexclusive factors to consider in determining whether a statute
establishes an appropriate standard for negligence per se liability:  (1)
whether the statute is the sole source of any tort duty from the defendant to
the plaintiff or merely supplies a standard of conduct for an existing
common-law duty; (2) whether the statute puts the public on notice by clearly
defining the required conduct; (3) whether the statute would impose liability
without fault; (4) whether negligence per se would result in ruinous damages
disproportionate to the seriousness of the statutory violation, particularly if
the liability would fall on a broad and wide range of wrongdoers; and (5)
whether the plaintiff=s
injury is due to a direct or indirect violation of the statute.  Id. at
309.








BP has correctly identified the Perry
factors in its brief.  However, this case does not involve the issue of whether
it would be proper to impose negligence per se liability for the violation of a
general penal statute.  Rather, this case involves a private cause of action
that has been created by the legislature.  By enacting Section 85.321, the
legislature created a cause of action in favor of a party who owns an interest
in property or production that may be damaged by another party=s violations of (1) the
provisions of Chapter 85, (2) another Texas law prohibiting waste, or (3) a
valid rule or order of the Railroad Commission.  Emerald, 2009 WL
795760, at *4.  In light of the Texas Supreme Court=s holding in Emerald and the clear
language of Section 85.321, we need not analyze Sections 85.045 and 85.321
under the Perry factors.  Section 85.045 was involved in the Emerald
case, and the Texas Supreme Court recognized that a private cause of action
exists for a violation of that statute.  In Section 85.321, the legislature
clearly established the conduct required for imposing liability:  a violation
of a provision of Chapter 85, another Texas law prohibiting waste, or a valid
rule or order of the Railroad Commission.  Emerald, 2009 WL 795760, at
*4.  Thus, based on Section 85.321, liability may be imposed for such
violations, and the legislature left no discretion to the courts to determine
otherwise.

BP also contends that the issues presented
by Discovery in its appeal from the summary judgment are moot.  BP=s contention is based on
the jury=s verdict in
Cause No. 11-08-00171-CV.  One of the elements of a negligence per se claim is
that the defendant=s
act or omission proximately caused the plaintiff=s
injury.  Ambrosio v. Carter=s
Shooting Ctr., Inc., 20 S.W.3d 262, 265 (Tex. App.CHouston [14th Dist.] 2000, pet. denied).  BP
asserts that, in Cause No. 11-08-00171-CV, the jury found that BP=s operations were not a
proximate cause of the water flow in Discovery=s
15-6 well.  BP argues that this finding negates the proximate cause element of
Discovery=s negligence
per se claims and, therefore, renders moot the issues presented by Discovery in
its appeal from the summary judgment.

In Cause No. 11-08-00171-CV, the trial court
submitted a broad-form negligence question to the jury:

Did the negligence, if any, of B.P. America Production
Company, in its operations of the Sanders A-25 saltwater injection well
proximately cause the uncontrolled water flow in the Discovery Operating, Inc.
Geronimo 15-6 well?

 

 








The jury answered Ano@ to the question.  Based on
the broad-form submission of the question, we cannot determine from the jury=s Ano@
answer whether the jury believed that BP was not negligent or that BP=s negligence was not a
proximate cause of the water flow.  See McRae v. Echols, 8 S.W.3d
797, 801 (Tex. App.CWaco
2000, pet. denied) (AThe
broad-form submission makes it impossible for a reviewing court to ascertain
whether the jury felt that Echols was not negligent or that his negligence was
not a proximate cause of the accident.@);
Carr v. Jaffe Aircraft Corp., 884 S.W.2d 797, 802 (Tex. App.CSan Antonio 1994, no writ)
(AThe jury=s negative answer [to a
broad-form negligence question] may have been based on a failure to find either
negligence or proximate cause.@). 
Therefore, the jury=s Ano@ answer cannot be used to establish a finding
on proximate cause, and BP=s
assertion that the jury made such a finding is incorrect.  The issues presented
by Discovery in its appeal from the summary judgment are not moot.

BP argues that, if the trial court erred in
granting summary judgment, the error was harmless.  A trial court=s erroneous decision to
grant summary judgment can be rendered harmless by subsequent events in the
trial court.  Progressive County Mut. Ins. Co. v. Boyd, 177 S.W.3d 919,
921 (Tex. 2005).  For example, a subsequent jury finding that negates an
essential element of the claim upon which the trial court erroneously granted
summary judgment renders the error harmless.  Id. at 921-22.  In Progressive,
the court concluded that the jury=s
finding on a breach of contract claim that no coverage existed under the
insurance policy negated recovery on the plaintiff=s extra-contractual claims; therefore, if the
trial court had erred in granting summary judgment on the extra-contractual
claims, the error was harmless.  Id.

BP=s
argument is based on its contention that the trial court granted summary
judgment only on Discovery=s
negligence per se claim for violations of Section 85.046 of the Natural
Resources Code.  Discovery alleged claims for negligence per se and for
statutory waste based on Section 85.046.  BP asserts that Discovery=s negligence per se claim
under Section 85.046 was cumulative of its statutory waste claim under
that statute and that, because the trial court did not grant summary judgment
on the statutory waste claim, any error in granting summary judgment on the
negligence per se claim was harmless.  BP contends that Discovery waived its
common-law and statutory waste claims by failing to request the trial court to
submit them to the jury.








We concluded above that the trial court
erroneously granted summary judgment to BP on all of Discovery=s negligence per se
claims.  Subsequent events in the trial court did not render the summary
judgment harmless.  The trial court severed the negligence per se claims from
the other claims in the case.  During the jury trial, both BP and Discovery
recognized that Anegligence
per se [was] out of the case.@ 
The trial court=s
summary judgment prevented Discovery from developing its negligence per se
claims and submitting them to the jury.  Even if BP is correct in its assertion
that Discovery=s
negligence per se claim based on the definition of Awaste@
in Section 85.046 was cumulative of its statutory waste claim, Discovery=s negligence per se claims
for violations of Section 91.143, Rules 9 and 46, and the injection permits
were not cumulative of other claims.  The jury=s
verdict did not negate recovery by Discovery on its negligence per se claims. 
The trial court=s
error in granting summary judgment was not harmless.  We sustain Discovery=s issue in Cause No.
11-08-00127-CV.  Therefore, the trial court=s
order granting summary judgment must be reversed, and Discovery=s negligence per se claims
must be remanded for a new trial.

Effect
of Summary Judgment Ruling on Remainder of the Case

We next consider whether the trial court=s erroneous decision to
grant summary judgment requires reversal of the judgment in Cause No.
11-08-00171-CV.  An error is harmful if it Aprobably
caused the rendition of an improper judgment.@ 
Tex. R. App. P. 44.1(a)(1); In
re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P., 290 S.W.3d 204, 211
(Tex. 2009) (orig. proceeding); Ford Motor Co. v. Castillo, 279 S.W.3d
656, 667 (Tex. 2009).  We review the entire record to determine whether an
error has resulted in harm.  Interstate Northborough P=ship v. State, 66
S.W.3d 213, 220 (Tex. 2001).

As a result of the trial court=s summary judgment ruling, Anegligence per se [was] out
of the case.@  As
such, Discovery was denied the opportunity to prove that BP violated Railroad
Commission rules or the terms of the permits for its injection wells.  The
summary judgment limited Discovery=s
presentation of its case and prevented it from receiving a fair trial.  Instead
of being able to proceed on its negligence per se claims, Discovery was forced
to present its case in a piecemeal fashion.  The parties hotly contested the
issues of negligence and causation.  During jury deliberations, the jury sent
the trial court a note stating, AJudge,
we are split on our vote.@ 
After receiving instructions from the trial court, the jury resumed
deliberations and ultimately returned a nonunanimous, ten-to-two answer to the combined
negligence and causation question in BP=s
favor.  While there is no way to know how the jury would have answered a
question submitting Discovery=s
negligence per se claims, the jury might have answered the negligence question
in Discovery=s favor
had the trial court given it the opportunity to consider the negligence per se
claims.  Based on our review of the entire record, we conclude that the trial
court=s erroneous
summary judgment and the resulting failure to submit Discovery=s negligence per se claims
to the jury probably caused the rendition of an improper judgment in Cause No.
11-08-00171-CV.  Therefore, the error in granting summary judgment was harmful.








We have concluded that the trial court=s error in granting summary
judgment harmed Discovery in Cause No. 11-08-00127-CV and in Cause No.
11-08-00171-CV.  Therefore, we will reverse the trial court=s judgments in both causes
and remand the causes for new trial.  We will next address the issues raised in
Cause No. 11-08-00171-CV.

                                       Evidentiary Issues
in Cause No. 11-08-00171-CV

Discovery contends that the trial court made
four erroneous evidentiary rulings during the jury trial.  Specifically,
Discovery argues that the trial court erred (1) in admitting Griffin=s Acavern@
testimony; (2) in admitting injection pressure data relating to the Queen
injection projects through the testimony of BP=s
experts, Williamson and Dr. Cobb; (3) in excluding expert testimony from Don
Sparks that BP violated the standard of care relating to the operation of its
injection wells; and (4) in admitting expert testimony from Railroad Commission
employees, Boger and Millhollon.

We review a trial court=s decision to admit or
exclude evidence under an abuse of discretion standard.  Interstate
Northborough P=ship,
66 S.W.3d at 220; City of Brownsville v. Alvarado, 897 S.W.2d 750, 753
(Tex. 1995).  A trial court abuses its discretion if it acts in an arbitrary or
unreasonable manner without reference to any guiding rules or principles.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).

An expert=s
opinion, to be admissible, must be relevant and reliable.  State v. Cent.
Expressway Sign Assocs., 302 S.W.3d 866, 870 (Tex. 2009); Exxon Pipeline
Co. v. Zwahr, 88 S.W.3d 623, 628 (Tex. 2002).  To be relevant, the expert=s opinion must be based on
the facts; to be reliable, the opinion must be based on sound reasoning and
methodology.  Cent. Expressway, 302 S.W.3d at 870; Zwahr, 88
S.W.3d at 629.  Expert testimony is unreliable if it is no more than Asubjective belief or
unsupported speculation.@ 
Zwahr, 88 S.W.3d at 629; City of Sugar Land v. Home & Hearth
Sugarland, L.P., 215 S.W.3d 503, 510 (Tex. App.CEastland 2007, pet. denied).

Griffin=s ACavern@ Testimony.








Griffin did not testify about his Acavern@ theory during the Daubert
proceedings.  Instead, he disclosed it for the first time at trial.  We have
quoted Griffin=s Acavern@ testimony above. 
Discovery argues that Griffin=s
Acavern@ testimony was inadmissible
because it was Ano
more than mere speculation and subjective belief.@ 
Griffin testified that the tour sheet indicated that Discovery stopped drilling
at 3,895 feet and, later, resumed drilling at 3,913 feet.  Griffin=s Acavern@
testimony was based on this 18-foot gap in the tour sheet.  In response to a
question by BP=s
counsel, Griffin testified that the 18-foot gap Aindicate[d]
that they didn=t need
to drill@ and that A[t]hey hit a cavern or
extremely soft formation or something like that down there, more likely a
cavern.@  Discovery
objected to this testimony on the ground that it was Apure speculation.@  The trial court overruled the objection, and
Griffin provided additional Acavern@ testimony that is set
forth above, speculating that the pressurized water came from the cavern.

Griffin=s
Acavern@ testimony was based solely
on his interpretation of the 18-foot gap in the tour sheet.  Rowell was the
toolpusher for TMBR/Sharp, and he was present when the water flow was encountered
in the 15-6 well.  Although BP called Rowell as its first witness at trial, BP=s counsel did not ask
Rowell about the 18-foot gap in the tour sheet or whether Discovery had hit a
cavern or soft formation during drilling.[8]
 No witness testified to any facts that would support the conclusion that
Discovery encountered a cavern or soft spot while drilling.  Because Griffin=s Acavern@
testimony was not supported by facts in evidence, the testimony was no more
than Griffin=s Asubjective belief or
unsupported speculation.@ 
Therefore, Griffin=s
ipse dixit Acavern@ testimony was unreliable
and inadmissible.  Zwahr, 88 S.W.3d at 629; Gammill v. Jack Williams
Chevrolet, Inc., 972 S.W.2d 713, 727-28 (Tex. 1998).








BP argues that Discovery waived its Aspeculation@ objection to Griffin=s Acavern@
testimony by allowing him to provide additional Acavern@ testimony without
objection.  As shown above, after the trial court overruled Discovery=s Aspeculation@
objection to Griffin=s
initial Acavern@ testimony, BP=s counsel essentially
summarized the Acavern@ testimony in his next
question to Griffin, and Griffin provided additional Acavern@
testimony in response to the question.  Discovery did not object to this question
or answer.  However, Discovery renewed its Aspeculation@ objection in response to
the next question asked by BP=s
counsel, and the trial court again overruled the objection.  Thus, although
Discovery did not object to one question and answer, Discovery immediately
renewed its objection in response to the next question.  Later, Griffin again
restated his Acavern@ theory, without objection,
that, Awhen they went
through that 18-foot level, it was at least [an] extremely soft formation, if
it existed at all, as compared to what they were drilling immediately above.@  At this point, the trial
court had already overruled two Aspeculation@ objections to Griffin=s Acavern@
testimony, and the trial court undoubtedly would have overruled another such
objection.  Under these circumstances, we conclude that Discovery did not waive
its Aspeculation@ objection to Griffin=s Acavern@
testimony.  See Atkinson Gas. Co. v. Albrecht, 878 S.W.2d 236, 242 (Tex.
App.CCorpus Christi
1994, writ denied) (A[W]hen
a party makes a proper objection to the introduction of certain testimony by a
witness and is overruled, he is entitled to assume that the judge will make the
same ruling as to other offers of similar evidence, and he is not required to
repeat the objection.@).

BP also argues that Discovery waived its
objections to Griffin=s
Acavern@ testimony because, during
cross-examination, Discovery asked him Ato
repeat in large part@
his Acavern@ testimony.  However, A[i]t is well settled that
cross-examination of a witness as to testimony improperly admitted over
objection does not waive the right to complain of the error.@  Chandler v. Welborn, 
294 S.W.2d 801, 810 (Tex. 1956).

Griffin=s
Acavern@ testimony was based on
unsupported speculation.  Therefore, the testimony was unreliable, and the
trial court abused its discretion in admitting it.[9]

Injection Pressure Data from Queen
Projects.

During the jury trial, BP=s counsel asked Williamson
whether he had prepared a factual study of the Queen injection units. 
Discovery=s counsel
objected to this question on the ground that Williamson had not expressed any
opinion on the Queen projects during the Daubert proceedings.  BP=s counsel responded that
Williamson was not going to express an expert opinion but was going to present Afactual data@ on the surrounding
floods.  BP=s counsel
stated that the Afactual
data@ refuted Dr.
MacDonald=s opinion
that the Queen projects were not the cause of the water flow in the 15-6 well. 
The trial court ruled that Williamson could testify to facts but that he could
not testify to expert opinions that were not tested during the Daubert
proceedings.  Williamson then testified that he had prepared graphs summarizing
information contained in H-10 injection sheets that were on file with the
Railroad Commission.  The graphs showed the volumes of injection and the
surface injection pressures used in the Queen projects.  Williamson testified
about the surface injection pressures shown in the graphs.  Williamson=s testimony showed that the
surface injection pressures in the Queen projects, such as 2,000 psi and 2,500
psi, were much higher than the injection pressures in BP=s 25 well.








BP=s
counsel also asked Dr. Cobb about work he had performed in studying the Queen
projects.  Discovery=s
counsel objected to the question on the ground that Dr. Cobb had not testified
to any opinion about the Queen floods during the Daubert proceedings. 
BP=s counsel responded
that Dr. Cobb would be testifying about factual evidence that was relevant to
whether or not Discovery had adequately excluded the surrounding floods as a
cause of the water flow in the 15-6 well.  In arguing that BP should be allowed
to question Dr. Cobb about the injection pressure data, BP=s counsel stated that A[i]t is up to the
Plaintiffs to rule out reasonable alternatives@
and that Awe are going
to show to the jury this data, and they can draw the conclusions they want to.@  The trial court indicated
that Dr. Cobb could testify about facts but not give any opinions about the
Queen floods.  Dr. Cobb then testified about the average surface injection
pressures for the Queen projects as shown on the graphs that Williamson had
prepared.  Dr. Cobb=s
testimony showed that the average surface injection pressures for the Queen
projects, such as 2,000 psi and 2,200 psi, were much higher than the average
surface injection pressure of about 900 psi to 950 psi for BP=s 25 well.  Dr. Cobb also
testified that he had calculated the pressure gradients for the Queen
projects.  According to Dr. Cobb=s
testimony, the pressure gradients for three of the Queen projects exceeded the
fracture pressure of the reservoirs.  Dr. Cobb testified that injecting at a
pressure above the fracture pressure creates cracks in the rock and allows the
water to move in paths that were previously not available.             Discovery
contends that Williamson=s
and Dr. Cobb=s Afactual@ testimony about injection
pressures in the Queen projects amounted to a previously undisclosed causation
opinion:  A[T]hat the
Queen waterfloods were the cause of the loss of the Discovery well.@  Discovery asserts that
this causation opinion was speculative and unreliable because it was solely
based upon surface injection pressures.  Therefore, Discovery argues that the
opinion was inadmissible.  BP responds that Williamson and Dr. Cobb merely
presented factual summaries of the data on which Dr. MacDonald and Platt had
relied in excluding the Queen projects as causes of the water flow in the 15-6
well.  BP states that A[t]he
summaries were relevant to Dr. MacDonald=s
and Platt=s opinion
that the Queen Water Floods could be eliminated as a potential source and cause
of the problems with the Geronimo 15-6.@ 
BP contends that the summaries Ashowed
that Discovery had not truly ruled out the Queen Water Floods.@








The injection pressures in the Queen
projects may have been relevant to Dr. MacDonald=s
and Platt=s opinions
that the Queen projects could be eliminated as the cause of the water flow in
the 15-6 well.  However, BP did not cross-examine Dr. MacDonald or Platt about
the injection pressures.  Instead, BP asked its own experts about the injection
pressures without tying the testimony to any specific expert opinion.  As
stated by BP=s
counsel, BP intended to allow the jury to draw its own conclusions from the
pressure injection data.  While neither Williamson nor Dr. Cobb testified to a
specific opinion that the Queen injection projects caused or could have caused
the water flow in the 15-6 well, their testimony about surface injection
pressures certainly suggested such an opinion to the jury.  Thus, the manner in
which BP presented the testimony about injection pressures was tantamount to
providing a previously undisclosed expert opinion.  In the absence of proper
expert opinion testimony from Williamson and Dr. Cobb that tied the injection
pressure data from the Queen projects to the issue of whether they could be
eliminated as a cause of the water flow in the 15-6 well, the jury was left to
speculate and could not make an informed decision on the issue.  We conclude
that the trial court erred in admitting the injection pressure data through the
testimony of Williamson and Dr. Cobb.

Exclusion of Testimony that BP Violated
the Standard of Care.

The trial court allowed Don Sparks to
testify that an industry standard of care applies to the operation of injection
wells and to describe the standard.  However, the trial court did not allow him
to testify that BP violated that standard.  With respect to the issue of
whether or not BP violated the industry standard of care, the trial court
stated, AI think that=s a question for the jury.@  Based on this reasoning,
the trial court apparently concluded that expert testimony was not proper on
the issue of whether BP violated the standard of care.  Thus, the trial court
ruled that Don Sparks could Atestify
to facts@ but could
not Aopine@ on whether or not BP
violated the industry standard of care.  The trial court also sustained BP=s objections to such
opinion testimony by Don Sparks on the grounds of relevance and speculation. 
During a bill of exception, Don Sparks testified that he did not believe that
BP met the industry standard.  He said that BP violated the standard by failing
to perform reservoir work to determine whether injected water was staying in
zone.








Expert testimony is necessary when the
alleged negligence is of such a nature as not to be within the experience of a
layman.  Roark, 633 S.W.2d at 809; Parker v. Three Rivers Flying
Serv., Inc., 220 S.W.3d 160 169 (Tex. App.CEastland
2007, no pet.);  Turbines, Inc. v. Dardis, 1 S.W.3d 726, 738 (Tex. App.CAmarillo 1999, pet.
denied).  In such a case, the expert testimony must establish both the standard
of care and the violation of that standard.  Simmons v. Briggs Equip. Trust,
221 S.W.3d 109, 114 (Tex. App.CHouston
[1st Dist.] 2006, no pet.); Parker, 220 S.W.3d at 169; Dardis, 1
S.W.3d at 738; Hager v. Romines, 913 S.W.2d 733, 734-35 (Tex. App.CFort Worth 1995, no writ). 
The operation of injection wells is not within the experience of a layman.  As
such, Discovery was required to present expert testimony on the standard of
care for the operation of injection wells and that BP=s conduct did not meet that standard.  Dardis,
1 S.W.3d at 738.

Don Sparks had reviewed BP=s records relating to its
operation of the 2D and 25 injection wells and the Railroad Commission=s records relating to those
wells.  The record demonstrates that  Don Sparks had studied in detail the
history of BP=s
operation of its injection wells and that he was familiar with BP=s operation of those
wells.  Based on his knowledge of the industry standard of care and of BP=s operation of its
injection wells, Don Sparks=s
opinion that BP had violated the standard of care was not based on
speculation.  His opinion testimony was also relevant to the issue of whether
BP violated the standard of care.  In fact, Discovery was required to present
such expert testimony on the issue.  Simmons, 221 S.W.3d at 114; Dardis,
1 S.W.3d at 738; Hager, 913 S.W.2d at 734-35.  Therefore, we conclude
that the trial court erred in excluding testimony from Don Sparks that BP
violated the standard of care for operating its injection wells.

Expert Testimony by Railroad Commission
Employees.

Based on our rulings on Discovery=s first three issues and
our finding below that those rulings caused harm to Discovery, we need not
address Discovery=s
fourth issue that the trial court erred in admitting expert testimony from
Boger and Millhollon.  Tex. R. App. P.
47.1.

                                                 Harm
Caused By Evidentiary Errors








Erroneous admission or exclusion of evidence
requires reversal if the error probably caused the rendition of an improper
judgment.  Cent. Expressway, 302 S.W.3d at 870; Nissan Motor
Co. v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004).  The Texas Supreme
Court has recognized the impossibility of prescribing a specific test to
determine whether a particular error is harmful and entrusts that determination
to the sound discretion of the reviewing court.  Cent. Expressway, 302
S.W.3d at 870.  In conducting a harm analysis, we review the entire record.  Cent.
Expressway, 302 S.W.3d at 870; Nissan, 145 S.W.3d at 144; Tex.
Dep=t of
Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000).  Typically, a successful
challenge to a trial court=s
evidentiary rulings requires the complaining party to demonstrate that the
judgment turns on the particular evidence excluded or admitted.  Interstate
Northborough P=ship,
66 S.W.3d at 220; Able, 35 S.W.3d at 617; Alvarado, 897 S.W.2d at
753-54.  Exclusion or admission of evidence is likely harmless if the evidence
was cumulative or if the rest of the evidence was so one-sided that the error
likely made no difference in the judgment.  Cent. Expressway, 302 S.W.3d
at 870; Reliance Steel & Aluminum Co. v. Sevcik, 267 S.W.3d 867, 873
(Tex. 2008).  But if erroneously admitted or excluded evidence was crucial to a
key issue, the error is likely harmful.  Cent. Expressway, 302 S.W.3d at
870; Reliance Steel, 267 S.W.3d at 873.  In determining whether the
erroneous admission of evidence is harmful, we may consider efforts made by
counsel to emphasize the evidence.  See Nissan, 145 S.W.3d at 144.

Causation of the water flow in Discovery=s 15-6 well was a key issue
at trial.  During the Daubert proceedings and at trial, Griffin
testified that, in his opinion, a Yates air blow caused the water flow in the
15-6 well.  Discovery countered this opinion with evidence that it was not
drilling in the Yates formation when it encountered the water flow, that the water
flow did not have the characteristics of a Yates air blow, and that Yates air
blows had not occurred in the area where it drilled the 15-6 well.  Griffin
presented his Acavern@ theory for the first time
at trial.  He testified that Discovery hit a Acavern
or extremely soft formation@
while drilling the 15-6 well and that Aa
cavern underneath the 15-6 well, that would account for a very rapid evacuation
of fluids from that zone.@


Through Griffin=s trial testimony, Discovery faced the
previously undisclosed opinion that drilling into a cavern caused the
high-pressure water flow in the 15-6 well.  Griffin=s Acavern@ testimony was not
cumulative of other evidence in the trial.  No other witness testified that a
cavern or soft formation was present under the 15-6 well.  In a case in which
causation was a hotly contested issue and in which much of the competing causation
evidence was sophisticated and complex, Griffin=s
speculative Acavern@ theory provided the jury
with a relatively simple and straightforward explanation for the water flow in
the 15-6 well:  that Discovery hit a cavern that was full of water.  As the
only evidence that a cavern existed under the 15-6 well, Griffin=s testimony was crucial to
a determination of the causation issue.    

Statements made by BP=s counsel during closing argument emphasized
Griffin=s Acavern@ testimony to the jury:

Mr. Griffin testified about the 18-foot break B drilling break, bit drop,
call it whatever you want to.  But there=s
18 feet there, according to the IADC report, which he says, in his opinion, is
the most reliable of the documents, because it is done simultaneously with what=s going on on that drilling
rig.

 

He says, AWhat
does that indicate to me?@

 

 








He says, AThey
hit a cavern or extremely soft formation or something like that down there,
more like a cavern.@

 

Well, if you think about it a minute, flowing 18 B or 15,000 barrels of B 1,500 barrels of fluid out
of that wellbore per hour, has got to take something other than the cement in
your garage floor as the vehicle for carrying that fluid.  It=s got to be like a cavern,
or it has got to be like a very, very porous sponge, because, remember, that=s what Dr. MacDonald said. 
It=s like your garage
floor.  It=s cement.

 


So it=s
not something water moves through easily.  And 1,500 barrels an hour is an
extreme amount of water.

 

These statements by BP=s counsel underscored the crucial nature of
Griffin=s Acavern@ testimony to the
determination of the causation issue.

Likewise, the testimony from Williamson and
Dr. Cobb about the injection pressures that were used in the Queen projects
amounted to a new causation opinion.  Their testimony encouraged the jury to
conclude that the Queen projects caused the water flow in Discovery=s 15-6 well.  BP=s counsel emphasized the
erroneously admitted evidence during closing argument:

These are Queen floods.  They are injecting into the Queen
interval, which is close to B
I won=t say it is
exactly the same, but it is close to the same interval, 3,900 foot interval
where the water flow occurred.

 

And look at the pressures they are injecting.  And look at
the bottom-hole pressures, 4,400 pound there, 4,162.

 

The significant thing was Dr. Cobb said that when you get to
70 B .7 to maybe .75
ratio of bottom-hole pressure per foot, this column, that you run the risk of
fracking the formation, if it gets above 7 or 7.5.  And that puts cracks B or can put cracks in the
formation.  And then the water follows the cracks and can go just about B and the pressure can
follow the cracks and go just about anywhere.

 

As the only evidence implying the conclusion that the Queen
projects caused the water flow in the 15-6 well, Williamson=s and Dr. Cobb=s testimony about the
injection pressures in the Queen floods was crucial to the causation issue. 
The emphasis placed on that testimony by BP=s
counsel certainly urged the jury to arrive at such a conclusion without expert
testimony, only argument by counsel, supporting that conclusion.








Whether BP violated the applicable standard
of care was another key issue at trial.  As stated above, Discovery was
required to establish with expert testimony the standard of care and BP=s violation of that
standard.  The erroneously excluded testimony by Don Sparks was the only expert
testimony that BP violated the standard of care.  As the only expert testimony,
the excluded evidence was critical to Discovery=s
proof of its negligence claim and was crucial to a key issue.

As a result of erroneously admitted
evidence, Discovery faced two new opinions that were crucial to the causation
issue.  As a result of the erroneously excluded evidence, Discovery could not
present expert testimony that was crucial to the issue of whether BP violated
the standard of care.  Based on the crucial nature of the erroneously admitted
evidence, the emphasis that BP=s
counsel placed on the erroneously admitted evidence, and the crucial nature of
the erroneously excluded evidence, we conclude that the trial court=s evidentiary errors
probably caused the rendition of an improper judgment and were, therefore,
harmful.  We sustain Discovery=s
first three issues in Cause No. 11-08-00171-CV and remand the cause to the
trial court for a new trial.

                                                                BP=s Cross-Points

BP presents two cross-points for review.  In
its first cross-point, BP contends that Discovery lacks standing and capacity
to assert the claims in Cause No. 11-08-00171-CV.  In its second cross-point,
BP contends that Discovery failed to comply with the requirements under Daubert
and E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex.
1995), for admission of expert testimony on causation.  Specifically, BP
contends that Discovery=s
experts, Dr. MacDonald and Platt, failed to rule out alternative causes of the
water flow in the 15-6 well and that, therefore, their causation testimony
should have been excluded.

                                             Discovery=s Standing and Capacity to
Sue

A party must have both standing and capacity
to bring a lawsuit.  Austin Nursing Ctr., Inc. v. Lovato, 171
S.W.3d 845, 848 (Tex. 2005).  Standing is a component of subject-matter
jurisdiction, and it is not to be confused with capacity.  Nootsie, Ltd. v.
Williamson County Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996).  AA plaintiff has standing
when it is personally aggrieved, regardless of whether it is acting with legal
authority; a party has capacity when it has the legal authority to act,
regardless of whether it has a justiciable interest in the controversy.@  Id.  Capacity
concerns Aa party=s personal right to come
into court,@ while
standing concerns Athe
question of whether a party has an enforceable right or interest.@  Lovato, 171 S.W.3d
at 849 (quoting 6A Charles Alan Wright
et al, Federal Practice and Procedure:  Civil 2d ' 1559, at 441 (2d ed. 1990)); Avco Corp.,
Textron Lycoming Reciprocating Engine Div. of Avco Corp. v. Interstate Sw.,
Ltd., 251 S.W.3d 632, 649 (Tex. App.CHouston
[14th Dist.] 2007, pet. denied).








BP contends that Discovery lacks standing
because it failed to prove that it owned the mineral estate in Section 15.  Don
Sparks testified that Discovery obtained an oil and gas lease from Apache
Company covering 480 acres in Section 15, and Discovery introduced into
evidence a copy of the lease.  BP relies on Murphy v. Tribune Oil Corp.,
656 S.W.2d 587, 589 (Tex. App.CFort
Worth 1983, writ dism=d),
in arguing that the evidence was insufficient to establish Discovery=s standing to maintain its
suit.  In Murphy, the plaintiffs alleged that they were successors in
title to the mineral estate in certain properties.  The defendants owned the
surface estate of the land in question.  The plaintiffs sought and obtained
from the trial court a temporary injunction that prohibited the defendants from
denying them access to the subject mineral interests.  Murphy, 656
S.W.2d at 588.  On appeal, the defendants asserted that there was no evidence
or insufficient evidence that the plaintiffs had title to or any other form of
right in the subject mineral estate.  Id. At the temporary injunction
hearing, the plaintiffs had not offered as evidence any written documentation
to prove that they were successors in title to the mineral estate.  Instead,
they sought to prove their status solely through oral testimony.  Id. at
589.  The court of appeals concluded that title to the minerals was directly in
issue in the case and stated the rule that, A[w]here
title to real property is directly in issue, proof of title must be made by
written instruments.@ 
Id.  Therefore, the court held that the oral testimony constituted no
evidence that the plaintiffs had any right or title to the mineral interests,
and the court dissolved the injunction.  Id.

Based on the rule stated in Murphy,
BP asserts that Discovery had the burden to prove the chain of title to the
minerals in Section 15 B
apparently from the sovereign to it B
by written instruments.  Because Discovery did not introduce into evidence a
written instrument proving that Apache owned the minerals at the time of its
lease to Discovery, BP contends that Discovery failed to meet its burden.  BP
states in its brief that, A[f]or
all that [it] knows, Discovery may have a fatal defect in the prior chain of
title.@








This case is factually distinguishable from Murphy. 
Discovery did not rely solely on oral testimony to prove its ownership of the
mineral interests.  Discovery presented the written lease agreement as evidence
supporting its ownership claim.  See Natural Gas Pipeline Co. of Am. v. Pool,
124 S.W.3d 188, 192 (Tex. 2003) (An oil and gas lessee acquires ownership of
all the minerals in place that the lessor owned and purported to lease.).  The
oil and gas lease, which was effective January 2, 2001, covered the mineral
interests in 480 acres in Section 15.  Discovery named the lease its AGeronimo lease.@  In addition to the lease
agreement, Discovery presented ample evidence supporting its ownership of the
minerals.  The evidence showed that Discovery entered the Geronimo lease and
drilled five wells on it over a period of about two years before drilling the
15-6 well.  There was no evidence that any party ever denied Discovery access
to the mineral interests.  Assuming that the rule stated by the Murphy
court applies to this case, we conclude that the written lease agreement,
coupled with the other evidence supporting Discovery=s ownership of the mineral interests,
satisfied any burden on the part of Discovery to prove its title.

We also conclude that title to the minerals
is not directly in issue in this case.  This case does not involve competing
claims to the mineral interests; it is not a trespass to try title case in
which the purpose of the suit is the recovery of title.  In fact, there were no
pleadings or evidence that any party other than Discovery owned the minerals. 
Based on these facts, title to the minerals is not directly in issue.  Brown
v. Brown, 520 S.W.2d 571, 577 (Tex. Civ. App.CHouston
[14th Dist.] 1975, writ dism=d);
Zieben v. Krakower, 346 S.W.2d 401, 405 (Tex. Civ. App.CHouston [1st Dist.] 1961,
writ ref=d n.r.e.). 
Instead, title to the minerals is only incidentally involved as a predicate to
Discovery=s recovery
of monetary damages.  Where title is only incidentally involved, proof of
ownership may be proven with any character of evidence that tends to establish
that fact, including oral testimony.  Brown, 520 S.W.2d at 577.  For
example, a deed is prima facie evidence of a grantee=s ownership.  In re Marriage of Murray,
15 S.W.3d 202, 205 (Tex. App.CTexarkana
2000, no pet.); Zieben, 346 S.W.2d at 405.  And, possession of real
property is prima facie evidence of ownership.  Zieben, 346 S.W.2d at
405; Garner v. McKinney, 255 S.W.2d 529, 531 (Tex. Civ. App.CEastland 1953, writ ref=d n.r.e.).

Discovery met its burden to establish that
it owned the subject mineral interests.  The evidence demonstrated that
Discovery has standing and capacity to sue.  We overrule BP=s first cross-point.

Exclusion
of Queen Floods as Cause of the Water Flow








In its second cross-point, BP contends that
Discovery=s experts
failed to eliminate the Queen projects as potential causes of the water flow in
the 15-6 well and that, therefore, their causation testimony should have been
excluded.  Trial courts may consider several factors when determining whether
expert testimony is reliable.  Merrell Dow Pharms., Inc. v. Havner, 953
S.W.2d 706, 714 (Tex. 1997); Robinson, 923 S.W.2d at 557-59.  One such
factor is whether the expert conducted testing to exclude other possible causes
of the damage.  Robinson, 923 S.W.2d at 558-59; Wyndham Int=l, Inc. v. Ace Am. Ins. Co.,
186 S.W.3d 682, 685 (Tex. App.CDallas
2006, no pet.).  Thus, an expert who is trying to find a cause of something
should carefully consider alternative causes.  Robinson, 923 S.W.2d at
559.  An expert=s
failure to rule out other causes of damage may render his or her opinion little
more than speculation.  Robinson, 923 S.W.2d at 559; Wyndham, 186
S.W.3d at 689.

Dr. MacDonald testified that he investigated
the waterflood projects that were located within about five miles of Discovery=s 15-6 well.  His
investigation included the Queen projects, which were located in the Moose
Queen reservoir, the Concho Bluff Queen reservoir, and the Concho Bluff North
Queen reservoir.  The Queen projects were about five miles away from the 15-6
well.  Dr. MacDonald testified that, in contrast, the War-San project,
which contained BP=s
25 well, was about a mile away from the 15-6 well.

Dr. MacDonald testified that he was
interested in comparing the amount of water and oil produced from the project
areas with the amount of water injected into the project areas. 
Dr. MacDonald said that he reviewed Railroad Commission records to make
these comparisons.  Using these records, Dr. MacDonald computed an
injection-to-production ratio for each of the projects that he studied.  Dr.
MacDonald testified that he initially considered data for the projects from
1982 forward.  Using this data, none of the Queen projects had an
injection-to-production ratio that exceeded 1 to 1.  Dr. MacDonald said that it
was significant that the ratios did not exceed 1 to 1 because Aif that ratio is less than
one, the likelihood that the water that=s
being injected into those reservoirs will escape is significantly less than
those reservoirs in which the injected water exceeds, and substantially exceeds
the amount of volume that was taken out of that reservoir.@  Based on the injection
ratios in the Queen projects and Atheir
proximity being somewhat removed from the 15-6 well,@ Dr. MacDonald concluded that they could be
eliminated as the cause of the water flow in the 15-6 well.








During cross-examination at the Daubert
proceedings, Dr. MacDonald acknowledged that Railroad Commission Bulletin 82
showed pre-1982 data for the Queen injection projects.  In a later Daubert
appearance, Dr. MacDonald testified that he had then included data going back
to 1972 in his study.  Dr. MacDonald prepared a graph showing his findings.  At
trial, Dr. MacDonald testified about the graph, and Discovery introduced the
graph into evidence.  Dr. MacDonald testified that the graph showed Athe cumulative injection in
barrels of water, divided by the cumulative production of oil plus water, in
time.@  The inclusion
of the pre-1982 data resulted in the injection-to-production ratios being
higher in the Queen projects.  The graph showed (1) that the
injection-to-production ratio for the Concho Bluff Queen projects peaked at
about 1.8 to 1 in the early 1990s and had come down to about 1.7 to 1 in 2003
when Discovery drilled the 15-6 well, (2) that the injection-to-production
ratio for the Concho Bluff North Queen projects peaked at about 1.5 to 1 in
1985 and had come down to about 1.3 to 1 in 2003, and (3) that the injection-to-production
ratio for the Moose Queen projects peaked at about 1 to 1 in 1982 and had come
down to about 0.8 to 1 in 2003.  Dr. MacDonald testified that the
injection-to-production ratio for the War-San project was 3.5 to 1 in 2003.

Dr. MacDonald testified that the inclusion
of the pre-1982 data in his study did not change his opinion that the
waterflood projects he studied, other than the War-San project, could be ruled
out as causes of the water flow in the 15-6 well.  He testified that the
injection-to-production ratios in the other projects, which included the Queen
projects, had remained relatively constant since 1975.  He said that a constant
injection-to-production ratio indicates that there is a Abalance between production and injection@ and that, when such a
balance exists, there is Ano
inclination for . . . any leakage to occur from the system.@  Dr. MacDonald testified
that, in his opinion, based on the 3.5 to 1 injection-to-production ratio in
the War San project, the period of time that the injection-to-production ratios
had remained constant in the other projects, and the distance from the other
projects to the 15-6 well, the other projects could be excluded as possible
causes of the water flow in the 15-6 well.  He said that the lack of proximity
between the other projects and the 15-6 well was an important consideration
because Ait has to be
transmitted over a longer distance, plus the fact it has to find a connected
path across that distance,@
and that, therefore, Athe
probability is much lower, as the distance increases from the 15-6 well.@








Platt also testified about Discovery=s investigation of the
surrounding waterflood projects.  He said that he gathered H-1 forms, H-10
forms, and other reservoir information and provided the information to Dr.
MacDonald to use in his study of the waterflood projects.  Platt said that
Dr. MacDonald tabulated the information and performed the calculations of
the injection-to-production ratios.  Platt testified that he and Dr. MacDonald
studied the War-San project and other projects in the area of the 15-6 well. 
He said that the other projects were a considerable distance away from the 15-6
well and that Discovery studied the other projects Ato eliminate [them] as a potential source of
pressure for the water flow in the 15-6 well, both by distance away, remote
locations, and by [Dr. MacDonald=s]
study of [their] injection/production ratios.@ 
Platt testified that the distance between the other projects and the 15-6 well
was a significant consideration because Aany
type of pressure response ha[d] a much longer distance to travel from these
projects that are further away@
and that, Athe further
away you get from the 15-6, the less likely that is of some source.@  Platt concluded that, in
his opinion, Athe
other projects four to five miles away were not the source of the pressure
increase that we saw at the 3,900 foot zone in the 15-6 well that resulted in
the water flow at that well.@

The evidence showed that Dr. MacDonald and
Platt investigated the Queen projects in an effort to exclude them as a
possible cause of the water flow in the 15-6 well.  Based on that
investigation,  Dr. MacDonald and Platt testified that the Queen floods could
be excluded as a cause of the water flow.  The reliability factor B whether the expert
conducted testing to exclude other possible causes of the damage B supports the admissibility
of the causation testimony of Discovery=s
experts.  We overrule BP=s
second cross-point.

                                                               This
Court=s Ruling

We reverse the judgments of the trial court
in these causes and remand them to the trial court for new trial.

 

 

TERRY McCALL

JUSTICE

 

April 15, 2010

Panel
consists of:  Wright, C.J.,

McCall,
J., and Boyd, S.J.[10]









[1]BP contends that the trial court granted summary
judgment on only one of Discovery=s
negligence per se claims.  For the reasons stated in this opinion, we conclude
that the trial court granted summary judgment on all of Discovery=s negligence per se claims.





[2]See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).





[3]TMBR/Sharp was Discovery=s
drilling contractor on the well.





[4]The permit for the 25 well allowed BP to inject fluids
into the San Andres formation at a depth interval from 6,070 feet to 6,170
feet.  The permit for the 2D well allowed BP to inject oil and gas waste into
the San Andres formation strata at a depth interval from 5,350 feet to 6,000
feet.





[5]Entex, a Div. of Noram Energy Corp. v. Gonzalez, 94 S.W.3d 1 (Tex. App.CHouston
[14th Dist.] 2002, pet. denied).





[6]We note that the trial court also ruled that Don
Sparks, who had been designated as an expert in petroleum engineering and
drilling and completing wells, could not testify about geology issues because
he had not been designated as an expert in geology.  This ruling is confusing. 
As a petroleum engineer, Don Sparks had obtained expertise in petroleum geology
in the Midland County area.  Therefore, the record appears to demonstrate that
the designation of Don Sparks as a petroleum engineer included his expertise in
petroleum geology.





[7]Tex. Nat. Res.
Code Ann. ch. 85 (Vernon 2001 & Supp. 2009).





[8]Although not necessary to our decision, we note that
Rowell stated in his post-trial affidavit that no soft spot or cavern had been
encountered during the drilling of the well and that the drill bit had not
dropped eighteen feet during drilling.





[9]Discovery also argues that Griffin=s Acavern@ testimony was
inadmissible because it was a Anew@ opinion that had not been properly disclosed during
the Daubert proceedings.  Based on our ruling that the trial court
should have excluded the Acavern@ testimony
because of its speculative nature, we need not address Discovery=s argument that the testimony was inadmissible because
it constituted a Anew@ opinion or BP=s argument that Discovery waived its Anew@ opinion
complaint by failing to object on that ground at trial.





[10]John T. Boyd, Retired Chief Justice, Court of Appeals,
7th District of Texas at Amarillo, sitting by assignment.